## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **W.A., individually, and as the Legal Representative of the ESTATE OF S.F.** | ) | |
| | ) | |
| **S.S.,** | ) | |
| | ) | |
| **M.S.,** | ) | |
| | ) | |
| **B.A.,** | ) | **Case No. 1:18cv1883** |
| | ) | |
| **S.A.,** | ) | |
| | ) | |
| **and** | ) | **JURY DEMANDED** |
| | ) | |
| **B.S. a minor, by and through his parent and natural guardian, S.S.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **THE ISLAMIC REPUBLIC OF IRAN,** | ) | |
| **Serve: Foreign Minister Mohammed Zarif** | ) | |
| **Ministry of Foreign Affairs** | ) | |
| **Khomeini Avenue** | ) | |
| **United Nations Street** | ) | |
| **Tehran, Iran** | ) | |
| | ) | |
| **HADI AL-AMIRI,** | ) | |
| | ) | |
| **BAQIR JABR Al-ZUBEIDI,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

Plaintiffs, by counsel, bring this action seeking damages arising out of the hostage taking, torture, and extrajudicial killing of S.F. that transpired between May 11, 2006 and May 16, 2006 in Baghdad, Iraq. Plaintiffs move for judgment against Defendants, the Islamic Republic of Iran, Hadi al-Amiri, and Baqir Jabr al-Zubeidi, and in support thereof allege as follows:

## I.      JURISDICTION AND VENUE

1.      Jurisdiction over the subject matter of this case arises under 28 U.S.C. §§ 1330(a), 1331, 1332(a)(2), 1367, and 1605A.

2.      Despite its status as a foreign state, the Islamic Republic of Iran ("Iran") is subject to suit in the courts of the United States pursuant to the Foreign Sovereign Immunities Act, as amended, specifically 28 U.S.C. § 1605A, due to Iran's formal designation as a "State Sponsor of Terrorism" at all times relevant to this Complaint.

3.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(4).

4.      Upon information and belief, Hadi al-Amiri ("Amiri") was domiciled in the Republic of Iraq ("Iraq") at the time of S.F.'s hostage taking, torture, and extrajudicial killing.

5.      Upon information and belief, Baqir Jabr al-Zubeidi ("Zubeidi") was domiciled in Iraq at the time of S.F.'s hostage taking, torture, and extrajudicial killing.

6.      S.F. was domiciled in Iraq at the time of his hostage taking, torture, and extrajudicial killing and was a citizen of Iraq.

7.      At the time of S.F.'s hostage taking, torture, and extradjudicial killing, S.F., S.S., and M.S. were performing a contract awarded by the United States Government and acting within the scope of that employment.

8.      The hostage taking, torture, and extrajudicial killing of S.F. occurred at the direction of and/or with the material support of Iran, Amiri, and/or Zubeidi, and, as a direct and intentional result of those acts, harmful effects occurred within the territory of the United States.

## II.      THE PARTIES

9.      Plaintiff W.A. is the widow of S.F. and is domiciled in the state of Idaho. She is also the legal representative of her deceased husband pursuant to D.C. Code Ann. § 12-101.

10. Plaintiff S.S. is the son of S.F. and is domiciled in the state of Idaho. He was employed by a company performing a contract awarded by the United States Government at the time of his father's hostage taking.

11. Plaintiff M.S. is the son of S.F. and is domiciled in the state of Idaho. He was employed by a company performing a contract awarded by the United States Government at the time of his father's hostage taking.

12. Plaintiff B.A. is the son of S.F. and is domiciled in the state of Idaho.

13. Plaintiff S.A. is the son of S.F. and is domiciled in the state of Colorado.

14. Plaintiff B.S. is the grandson of S.F. and is domiciled in the state of Idaho.

15. Defendant Iran is a foreign state. Since January 19, 1984, Iran has been designated as a state sponsor of international terrorism pursuant to Section 6(j) of the Export Administration Act of 1979, 50 U.S.C. § 2405(j), and the Foreign Assistance Act of 1961, 22 U.S.C. § 2371(b).

16. Defendant Amiri is a dual citizen of Iraq and Iran, a member of the Iraqi Parliament, and leader of the Badr Organization.

17. Defendant Zubeidi, also known as Bayan Jabr Solagh, is a dual citizen of Iraq and Iran, the former Iraqi Minister of Interior, and a former commander of the Badr Brigade.

III.   **FACTUAL ALLEGATIONS**

A.   **The Formation of the Badr Organization**

18. After the Iranian Revolution of 1979, and the rise of a powerful Shia government in Iran, tensions quickly grew between Iran and the neighboring Iraqi government of Saddam Hussein.

19. The Iran-Iraq War began in September 1980 and fighting continued until 1988.

20.     The Supreme Council for the Islamic Revolution in Iraq ("SCIRI") was formed in 1982 and operated as the largest Shia political party opposing the rule of Saddam Hussein.

21.     SCIRI operated from within Iran from the time of its founding until the overthrow of Saddam Hussein in 2003.

22.     The Badr Brigade was formed by Amiri in 1983 to serve as the armed wing of the SCIRI.

23.     After the formation of the Badr Brigade, members of the Brigade were supplied, trained, and fought alongside the Iranian Revolutionary Guard Corps ("IRGC") throughout the remaining years of the Iran-Iraq War.

24.     After the Iran-Iraq War, the Badr Brigade continued to support efforts within Iraq to oppose the rule of Saddam Hussein through various means, including the smuggling of people and weapons into Iraq from Iran.

25.     Before 2003, the Badr Brigade operated as Iran's surrogate within Iraq, a *de facto* arm of the IRGC Quds Force ("IRGC-QF").

26.     Zubeidi served as one of the commanders of the Badr Brigade while it was located within Iran.

27.     Throughout this period, the IRGC, IRGC-QF, and/or Hezbollah, an Iranian proxy acting on Iran's direction, trained the Badr Brigade and its leaders in insurgency and terrorist tactics such as the use of improvised explosives, assassinations, and kidnappings.

28.     Both Amiri and Zubeidi forged close relationships during this time with senior Iranian officials, including Qasem Soleimani, the leader of the IRGC-QF. These relationships persist today and have served as one of the primary means by which Iran supports, advises, and directs its desired activities within Iraq.

### B.     Rebuilding Iraq

29.     S.F. owned and operated a contracting company that was based in Baghdad, Iraq, a predecessor of which he had started in 1989 as a small import/export company.

30.     Following the Gulf War, S.F. took advantage of increased opportunities for international engagement to substantially grow the company, which eventually received a rating of "Excellent" from the Iraqi government. This was a step above the original highest rating of "1" on Iraq's 1–5 scale and was reserved for only the select few companies that far exceeded the output of even the largest and most successful companies in Iraq.

31.     One substantial contract the company secured in 2001 was to rehabilitate three oil fields in southern Iraq. S.F. came to own stock in the Iraqi national oil company during this time period.

32.     On March 19, 2003, a coalition army, led by the United States, invaded Iraq and ended the reign of Saddam Hussein. The invasion was largely complete within one month and the rebuilding effort began in earnest.

33.     The Coalition Provisional Authority ("CPA"), a transitional government in Iraq, began operating in May 2003 with the goal of providing stable governance, promoting the development of a functional democracy, and reconstructing key infrastructure.

34.     S.F. and his company were among the first Iraqis to join the CPA and work with the American military in rebuilding Baghdad's infrastructure.

35.     This relationship began on small projects working directly with the US military, but S.F. and his company quickly gained a reputation among the Americans for efficient and quality work.

36.     When the CPA decided to construct a new building for the Commission on Public Integrity, an organization tasked with investigating corrupt Iraqi government officials, S.F.'s company was awarded the project. As part of the project, the company was trusted with sensitive information such as the location of the separate building used to house potential witnesses against corruption.

37.     Impressed with this work and the integrity of those running the company, officials within the Army Corp of Engineers invited S.F. to bid on a contract to assist with the reconstruction of the electrical grid in Baghdad. This contract was awarded to S.F.'s company and finalized in December 2005. The first work order was issued on January 9, 2006.

38.     Once this work began, S.F. and his employees started receiving threats. The company's chief engineer was kidnapped on February 18, 2006 and was not released until the following day after the company paid a ransom and the engineer promised to stop working with the Americans.

39.     This did not intimidate S.F. or his employees into abandoning the project. Instead, on February 19, 2006, M.S. (speaking on behalf of his family and the company), informed their American contact that "we still want to work with you in spite of all the risks taken."

40.     The company continued its reconstruction work over the coming months, but did so more cautiously, mixing its work on the American contract with charitable work in the same neighborhoods, building playgrounds, restoring street lighting, and other similar work, all to counteract and cover the nature of its presence in the various locations where the company worked.

### B.     The Badr Organization in Post-War Iraq

41.     The SCIRI and the Badr Brigade publicly returned to Iraq after the fall of Saddam

Hussein in 2003. Because of their longstanding opposition to Saddam Hussein, both groups were

welcomed as participants in a new and inclusive Iraqi government.

42.     In order to appear less militant in its approach, the SCIRI renamed the Badr

Brigade as the Badr Organization of Reconstruction and Development ("Badr Organization")

and later renamed itself as the Supreme Islamic Iraqi Council.

43.     Despite its rise to public prominence in Iraq, the Badr Organization continued to

receive guidance, training, weapons, and funding from Iran through the IRGC, the IRGC-QF,

and/or Hezbollah.

44.     As of 2005, the Badr Organization was receiving as much as $3,000,000 from

Iran each month.

45.     Through the early years of the CPA, interim, and transitional governments, the

leaders of the SCIRI and the Badr Organization became increasingly involved in Iraq's

developing political structure.

46.     Through the success of this political involvement, SCIRI was given control over

Iraq's Ministry of Interior and Zubeidi was appointed the Minister of Interior in April 2005.

47.     The Ministry of Interior is the Iraqi government agency responsible for policing

activities and border enforcement.

48.     Zubeidi used this appointment to provide members of the Badr Organization with

positions of authority and influence within the Ministry of Interior.

49.     Zubeidi also flooded the ranks of police units, such as the Special Police, with

members of the Badr Organization militia forces who were loyal to him and Amiri.

50.     By the end of 2005, this influence extended not only to smaller paramilitary forces such as the Special Police, but also deeply into the ranks of traditional police officers and highway patrol police under the Ministry of Interior's control.

51.     Because of this widespread infiltration, the leaders of the Badr Organization, such as Zubeidi and Amiri, were able to exert direct command and control over large segments of Iraq's police force, particularly within the city of Baghdad, and were able to use that to advance the objectives of the Badr Organization.

52.     One American general observed that many police officers "still [wore] Badr T-shirts under their uniform."

53.     The United Nations human rights chief in Iraq, John Pace, referred to the Ministry of Interior during this time "as a rogue element" within the Iraqi government.

54.     Zubeidi, Amiri, and the Badr Organization used this influence to exert power over groups with opposing viewpoints such as Sunnis and those cooperating with the Americans. These violent methods became a well-known problem within Baghdad and led to the use of the term "death squads."

55.     Amiri is reported to have personally ordered attacks on as many as 2,000 Sunnis between 2004 and 2006. One of his preferred methods of torture and killing involved the use of a power drill.

56.     In July 2005, the Baghdad Medico-Legal Institute reported that the city's morgue received 1,100 bodies, and that approximately 900 of those bodies displayed evidence of torture or summary execution.

57.     The deployment of "death squads" and the torture and killing of innocent civilians were planned, authorized, and/or directed by Zubeidi, Amiri, and the Badr Organization, with the

guidance, training, support, and funding of Iran, for the purpose of expanding the influence of

the Badr Organization within Iraq and in support of Iran's foreign policy objectives of

destabilizing Iraq, suppressing Sunni opposition, and threatening American interests in the

region.

      **C.**      **The Hostage Taking, Torture, and Extrajudicial Killing of S.F.**

58.      On May 11, 2006, S.F. was kidnapped in broad daylight from his company's main

branch office by police officers from a nearby police checkpoint.

59.      When M.S. called his father's phone later that evening to inquire about his

whereabouts, one of the kidnappers answered and directed him to come to the Al Sha'ab police

station to collect S.F.'s car.

60.      M.S. immediately reached out to his American contacts to inform them of what

had happened and to ask for assistance in finding and retrieving his father.

61.      Within the first two days, the family received several phone calls during which

they could hear S.F. being tortured and screaming for help. The torture included the use of power

drills on his body.

62.      The purpose of these calls was to intimidate S.F.'s family, crush their spirits, and

force them to be compliant with the forthcoming demands.

63.      On May 13, 2006, S.F.'s family received a phone call from individuals claiming

to be associated with the police who told the family to come to the Ministry of Interior building

for information about S.F.'s kidnapping.

64.      The family went to the Ministry of Interior building that same day hopeful that the

Americans had secured S.F.'s release.

65.     Instead, the Ministry of Interior officials who met them proceeded to make demands for the release of S.F. The initial demands were:

- Terminate the contract with the United States;

- Pay a ransom of $150,000; and

- Surrender all documents obtained through work with the Americans.

66.     S.F.'s family asked for three days to respond to these demands. As soon as they left the Ministry of Interior building they called their American contacts and informed them of the demands. The Americans told them not to pay the money because it would only be used to fund additional terrorism activities and terrorist attacks.

67.     Over the next two days, police officers and Badr militia members broke into the family's residence and ransacked it. The family also continued to receive phone calls where they could hear the continued torture of S.F.

68.     Finally, on May 15, 2006, the family agreed to meet the kidnappers and pay the ransom but told the kidnappers that they could not turn the documents over until later. Though they were willing to risk their money and their safety to save S.F., the family had no intention of betraying the Americans' confidences by turning over sensitive documents.

69.     The kidnappers assigned a place and time for the exchange and S.S. volunteered to make the delivery. M.S. called the Americans for help, but no one came or otherwise provided assistance.

70.     The place for the anticipated exchange was a police checkpoint.

71.     S.S. showed up at the time and place designated but the kidnappers did not produce S.F. Instead, the kidnappers tried to kill S.S., but he was able to escape.

72.     The next day, on May 16, 2006, M.S. went to the Baghdad morgue to search for his father.

73.     M.S., a physician, recognized his father's body and was able to see that he was killed by multiple gun shots to the back of the head by a pistol from close range and that he had many wounds consistent with being tortured with a power drill.

74.     M.S. was informed that the identification number associated with S.F.'s body was "marked" so that the police and militia would be notified when the body was retrieved.

75.     M.S. secretly removed his father's body from the morgue, carrying it home over his shoulder, in order to give him a proper burial.

76.     Because they were afraid for their own lives, the family could not bring S.F.'s body to an undertaker but did their best to care for the body themselves. W.A. and all four of S.F.'s sons viewed the body, witnessing first-hand the deformities and drill holes from the torture that they had heard on the phone calls.

**D.     The Family Becomes Refugees**

77.     The same day that M.S. found S.F.'s body, the family abandoned their home and began to flee for their own safety. Within days, the home had been thoroughly ransacked by police officers and Badr militia members and any belongings either stolen or tossed to the curb.

78.     The family avoided multiple assassination attempts while hiding out in Baghdad.

79.     Unable to live or work openly, the family was forced to abandon S.F.'s company and terminate the contract with the Americans.

80.     The family fled to Jordan on November 17, 2006 as refugees.

81.     Each member of the family lost their home, career, friends, and possessions as a result of this exile.

82.     The oil company stock owned by S.F. last paid a dividend in 2003. After the overthrow of Saddam Hussein, the Badr Organization came to exert substantial influence over the oil company.

83.     On August 12, 2008, after S.F.'s family had spent nearly two years living in squalid refugee conditions in Jordan, with no access to judicial or political resources that would allow redress for the death of S.F., M.S. was the first of S.F.'s family to obtain asylum in America. The last of the family member plaintiffs to receive asylum was W.A., who arrived in America in 2013. Today, they all reside in the United States and are naturalized American citizens.

## IV.    CAUSES OF ACTION

**COUNT I**
**PROVIDING MATERIAL SUPPORT AND RESOURCES FOR**
**HOSTAGE TAKING, TORTURE, AND THE EXTRAJUDICIAL KILLING OF S.F.**

84.     Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

85.     In May 2006, S.F., S.S., and M.S. were individuals performing a contract awarded by the United States Government.

86.     Iran has provided material support and resources to the Badr Organization, Amiri and/or Zubeidi for the purpose of supporting, enabling, advancing, and benefiting from the general unrest in Iraq, to increase its political influence within Iraq, and to provide resistance to the United States by attacking members of the military, taking hostages, disrupting American reconstruction efforts, and generally attempting to force the United States out of Iraq.

87.     That material support and resources included, but was not limited to, weapons, funding, training, guidance, diplomatic support, logistical support, and safe-haven.

88.     As such, Iran's provision of material support and resources to the Badr

Organization, Amiri, and/or Zubeidi was intentional, wanton, and willful, with the understanding

that violence against Americans, or any Iraqis working with Americans, was an expected and

welcomed result of such support.

89.     Iran and/or members of the Badr Organization and/or Amiri and/or Zubeidi

directed the hostage taking, torture, and killing of S.F. in May 2006.

90.     As a direct and proximate result of Iran's willful, wrongful, and intentional acts,

in providing material support and resources to the Badr Organization and its leaders and/or its

direction of that organization's actions, S.F. was taken hostage and tortured.

91.     As a direct and proximate result of Iran's actions, S.F. endured severe pain and

suffering during his period of captivity and leading to his death.

92.     As a direct and proximate result of Iran's actions, S.F. was killed without any

justification under law and in the complete absence of internationally recognized human rights.

93.     As a direct and proximate result of Iran's actions, the Estate of S.F. has

experienced substantial economic losses.

94.     As a direct and proximate result of Iran's actions, S.S. and M.S. have experienced

significant solatium damages including, but not limited to, severe mental anguish and harm

caused by the loss of S.F.'s society and comfort and by the manner in which he was killed.

95.     Iran's continuing provision of material support to those willing to commit hostage

taking, torture, and murder is criminal, outrageous, extreme, wanton, willful, malicious, and a

threat to the public warranting an award of punitive damages.

96.     Such conduct violates 28 U.S.C. § 1605A.

97.     A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

## COUNT II
## WRONGFUL DEATH AS TO S.F.

98.     Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

99.     Defendants' actions constituted negligence, carelessness, gross negligence, recklessness, intentional, and/or malicious conduct.

100.     Defendants were and are directly responsible for the death of S.F. through these wrongful, negligent, reckless, and/or intentional acts and failures to act.

101.     Defendants conspired to bring about the death of S.F. through these wrongful, negligent, reckless, and/or intentional acts and failures to act.

102.     Defendants aided and abetted the death of S.F. through these wrongful, negligent, reckless, and/or intentional acts and failures to act.

103.     S.F.'s death was proximately caused by the wrongful, negligent, reckless and/or intentional acts of Defendants and/or their failures to act.

104.     S.F. is survived by his wife and four children.

105.     As a result of the death of S.F., his wife and children have suffered severe and substantial damages, including, but not limited to, the loss of income, care, and assistance provided by S.F.

106.     In addition to compensatory damages, Plaintiffs seek punitive damages for Defendants' willful and wanton conduct and/or recklessness, which evinced a conscious disregard for the safety of S.F. and caused his death.

## COUNT III
## LOSS OF CONSORTIUM AS TO W.A.

107.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

108.    Defendants' actions constituted negligence, carelessness, gross negligence, recklessness, intentional, and/or malicious conduct.

109.    Defendants were and are directly responsible for the death of S.F. through these wrongful, negligent, reckless, and/or intentional acts and failures to act.

110.    Defendants conspired to bring about the death of S.F. through these wrongful, negligent, reckless, and/or intentional acts and failures to act.

111.    Defendants aided and abetted the death of S.F. through these wrongful, negligent, reckless, and/or intentional acts and failures to act.

112.    S.F.'s death was proximately caused by the wrongful, negligent, reckless and/or intentional acts of Defendants and/or their failures to act.

113.    S.F. is survived by his wife, W.A.

114.    W.A. has suffered severe and substantial damages as a result of the loss of her husband and companion and the deprivation of his society and affection.

115.    In addition to compensatory damages, Plaintiffs seek punitive damages for Defendants' willful and wanton conduct and/or recklessness, which evinced a conscious disregard for the safety of S.F. and caused his death.

## COUNT IV
## CONSPIRACY TO COMMIT ASSAULT AND
## BATTERY AGAINST ALL FAMILY MEMBER PLAINTIFFS

116.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

117.     The Badr Organization, acting through its leaders and members, is responsible for acts of assault and battery upon the family of S.F., including, but not limited to, the attempted murder of S.S. on May 15, 2006 and multiple assassination attempts in the months after the death of S.F.

118.     Iran, in its role as the supplier, director, trainer, and state sponsor of the Badr Organization, knowingly and willfully conspired to direct, cause, and/or bring about these acts of assault and battery.

119.     Amiri, in his role as founder and leader of the Badr Organization, knowingly and willfully conspired to direct, cause, and/or bring about these acts of assault and battery.

120.     Zubeidi, in his role as a prominent member of the Badr Organization, knowingly and willfully conspired to direct, cause, and/or bring about these acts of assault and battery.

121.     By engaging in this conspiracy, Iran, Amiri, and Zubeidi intended to initiate harmful or offensive contact with the family of S.F., without their consent, and to otherwise create in S.F.'s family the apprehension of impending force.

122.     Therefore, Iran, Amiri, and Zubeidi are responsible for the damages suffered by S.F.'s family as a direct and proximate result of these acts of assault and battery.

123.     Because the conspiracy to commit assault and battery was formed and carried out in a willful and wanton manner, showing a conscious disregard for the rights of others, Plaintiffs request an additional award of punitive damages.

## COUNT V
## AIDING AND ABETTING THE ACTS OF ASSAULT
## AND BATTERY AGAINST ALL FAMILY MEMBER PLAINTIFFS

124.     Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

125.    The Badr Organization, acting through its leaders and members, is responsible for assault and battery upon the family of S.F., including, but not limited to, the attempted murder of S.S. on May 15, 2006 and multiple assassination attempts in the months after the death of S.F.

126.    Iran, in its role as the supplier, director, trainer, and state sponsor of the Badr Organization, knowingly and willfully aided and abetted these acts of assault and battery.

127.    Amiri, in his role as founder and leader of the Badr Organization, knowingly and willfully aided and abetted these acts of assault and battery.

128.    Zubeidi, in his role as a prominent member of the Bader Organization, knowingly and willfully aided and abetted these acts of assault and battery.

129.    By providing substantial assistance to the Badr Organization, Iran, Amiri, and Zubeidi intended that the Badr Organization would initiate harmful or offensive contact with individuals such as the family of S.F., without their consent, and to otherwise create in them an apprehension of impending force.

130.    Therefore, Iran, Amiri, and Zubeidi are responsible for the damages suffered by S.F.'s family as a direct and proximate result of these acts of assault and battery.

131.    Because the aiding and abetting of assault and battery was carried out in a willful and wanton manner, showing a conscious disregard for the rights of others, Plaintiffs request an additional award of punitive damages

## COUNT VI
## CONSPIRACY TO COMMIT INTENTIONAL
## INFLICTION OF EMOTIONAL DISTRESS AGAINST ALL PLAINTIFFS

132.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

133.    The Badr Organization's use of confinement, physical abuse, torture, and intimidation was intentional and reckless, extreme and outrageous, and caused S.F. and his family severe emotional distress.

134.    The treatment of S.F., particularly the use of power drills in torture, violated acceptable norms of humane treatment under the laws of the United States and International Law, thereby qualifying as extreme and outrageous.

135.    The intentional broadcasting of the sounds of that torture to a victim's family is also extreme and outrageous conduct. Such acts were done with the intent to intimidate and coerce S.F.'s family.

136.    The extrajudicial killing of S.F. violated the laws of the United States and acceptable norms of international law by which all civilized nations transact their affairs.

137.    These actions severely impacted S.F.'s family emotionally and psychologically, particularly because members of the Badr Organization called S.F.'s family to ensure that they were aware of the severity of the torture.

138.    Iran, Amiri, and Zubeidi, through their influence with the Badr Organization, knowingly and willfully conspired to direct, cause, and bring about these acts of intentional infliction of emotional distress.

139.    Therefore, Iran, Amiri, and Zubeidi are responsible for the damages suffered by Plaintiffs as a direct and proximate result of this intentional infliction of emotional distress.

140.    Because this conspiracy to commit intentional infliction of emotional distress was done in a willful and wanton manner, showing a conscious disregard for the rights of others, Plaintiffs request an additional award of punitive damages.

## <u>COUNT VII</u>
## AIDING AND ABETTING THE COMMISSION OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST ALL FAMILY MEMBER PLAINTIFFS

141.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

142.    The Badr Organization's use of confinement, physical abuse, torture, and intimidation was intentional and reckless, extreme and outrageous, and caused the family of S.F. to experience severe emotional distress.

143.    The treatment of S.F., particularly the use of power drills in torture, violated acceptable norms of humane treatment under the laws of the United States and International Law, thereby qualifying as extreme and outrageous.

144.    The intentional broadcasting of the sounds of that torture to a victim's family is also extreme and outrageous conduct. Such acts were done with the intent to intimidate and coerce S.F.'s family.

145.    The extrajudicial killing of S.F. also violated the laws of the United States and acceptable norms of international law by which all civilized nations transact their affairs.

146.    These actions severely impacted S.F.'s family emotionally and psychologically, particularly because members of the Badr Organization called S.F.'s family to ensure that they were aware of the severity of the torture.

147.    Iran, Amiri, and Zubeidi, through their influence with the Badr Organization, knowingly and willfully aided and abetted these acts of intentional infliction of emotional distress.

148.    Therefore, Iran, Amiri, and Zubeidi are responsible for the damages suffered by Plaintiffs as a direct and proximate result of this intentional infliction of emotional distress.

149.    Because this substantial assistance to the commission of acts of intentional

infliction of emotional distress was provided in a willful and wanton manner, showing a

conscious disregard for the rights of others, Plaintiffs request an additional award of punitive

damages.

## V.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court grant judgment against each Defendant as

follows:

Against the Islamic Republic of Iran, on all Counts, for a total sum of $212,000,000,

allocated accordingly:

      a.    Damages for pain and suffering, including torture, experienced by S.F. in the amount of $10,000,000 to the Estate of S.F.;

      b.    Economic losses suffered by the Estate of S.F. in the amount of $5,000,000;

      c.    Damages for solatium, attempted assault and battery, and intentional infliction of emotional distress in a total amount of $47,000,000, comprised of the following sums:

            -    $12,000,000 on behalf of W.A., widow of S.F.;
            -    $7,500,000 on behalf of S.S., son of S.F.;
            -    $7,500,000 on behalf of M.S., son of S.F.;
            -    $7,500,000 on behalf of B.A., son of S.F.;
            -    $7,500,000 on behalf of S.A., son of S.F.;
            -    $5,000,000 on behalf of B.S., grandson of S.F.;

      d.    Punitive damages in the amount of $150,000,000, allocated proportionately with the compensatory judgments awarded to Plaintiffs.; and

      e.    Such other and further relief as the Court may determine to be just and equitable under the circumstances.

Against Hadi Al-Amiri and Baqir Jabr al-Zubeidi, jointly and severally, on Counts II

through VII, for a total sum of $124,000,000, allocated accordingly:

      a.    Damages for pain and suffering, including torture, experienced by S.F. in the amount of $10,000,000 to the Estate of S.F.;

    b.   Economic losses suffered by the Estate of S.F. in the amount of $5,000,000;

    c.   Damages for attempted assault and battery and intentional infliction of emotional distress in a total amount of $47,000,000, comprised of the following sums:

-    $12,000,000 on behalf of W.A., widow of S.F.;
-    $7,500,000 on behalf of S.S., son of S.F.;
-    $7,500,000 on behalf of M.S., son of S.F.;
-    $7,500,000 on behalf of B.A., son of S.F.;
-    $7,500,000 on behalf of S.A., son of S.F.;
-    $5,000,000 on behalf of B.S., grandson of S.F.;

    d.   Punitive damages in the amount of $62,000,000, allocated proportionately with the compensatory judgments awarded to Plaintiffs.; and

    e.   Such other and further relief as the Court may determine to be just and equitable under the circumstances.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Respectfully submitted,

_____/s/ Kevin A. Hoffman_____

Randy D. Singer (VA Bar No. 26501)
Kevin A. Hoffman (D.C. Bar No. 1044559)
SINGER DAVIS, LLC
1209A Laskin Road
Virginia Beach, VA 23451
Phone: (757) 301-9995
Fax: (757) 233-1084
Email: randy.singer@singerdavis.law
Email: kevin.hoffman@singerdavis.law
*Counsel for Plaintiffs*