IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| W.A., individually, and as the Legal Representative of the ESTATE OF S.F. et al., | ) ) ) |
| Plaintiffs, | ) )   Case No. 1:18cv1883 |
| v. | ) ) ) |
| THE ISLAMIC REPUBLIC OF IRAN et al., | ) ) |
| Defendants. | ) |

**RESPONSE TO ORDER OF THE COURT FOR ADDITIONAL INFORMATION**

COME NOW Plaintiffs, by counsel, with the following information in response to the Order of July 10, 2019 requesting "more information about the factual circumstances of S.F.'s kidnapping" and expressing the Court's concern regarding whether S.F. was operating within "the scope of his employment" at that moment in time. ECF No. 30 at 1–2.

This information is provided by Plaintiffs in the form of a supplemental sworn declaration from M.S., the son and co-worker of S.F., based upon his personal knowledge of the specific events he describes and the inner workings of the family business in 2006. This supplemental declaration is attached to this filing as "Exhibit A."[1]

Late in 2005, S.F. and his company entered into a Multiple Award Task Order Contract ("MATOC") for work on electrical distribution network construction projects throughout Baghdad. Ex. A at ¶ 3. As part of this MATOC, the company expected to receive a substantial,

---

[1] Through previous correspondence with M.S., in preparation for filing the request for default judgment, Plaintiffs' counsel learned that S.F. was on his way "to have lunch and say goodbye to a friend who also owns a company two blocks away." Notes Sent via E-Mail on Apr. 16, 2019. Because counsel was relying on the legal theory that S.F.'s kidnapping occurred *because of* his employment, and therefore qualified as within the scope of his employment, no further inquiry was made about the events that gave rise to the lunch meeting. Following receipt of this Court's Order, ECF No. 30, additional inquiry was made regarding the details of the lunch and the attached Supplemental Declaration of M.S. is the result of that inquiry. If the Court prefers for M.S. to testify live, M.S. is prepared to attend Court so he may testify to the events described in his sworn declarations and to answer any questions the Court might have.

but unspecified, number of work orders ranging from $200,000 to $3,000,000 each in contract value. *Id.* The task orders issued over the first year of the contract were expected to be worth $80,000,000. *Id.*

Each new phase of the MATOC was to be initiated through the delivery of a Notice to Proceed letter. Task Order 0003, which involved a large-scale installation of electrical cables, was initiated with a Notice to Proceed letter sent on March 25, 2006. Ex. A-1. Anticipating these large orders, S.F. had arranged a deal with a local supplier of electrical cables that he intended to use throughout the duration of the MATOC. Ex. A at ¶ 7.

On April 20, 2006, however, a large car bomb exploded near the main offices of S.F.'s company. *Id.* As a result of the damage and disruption caused by the explosion, the pre-arranged local supplier of electrical cables was unable to make its scheduled delivery, causing delay to one of the MATOC projects. Ex. A at ¶ 8. This disruption convinced S.F. that he needed to secure a second supplier of electrical cables to lessen the chances of delay and to increase cost certainty moving forward. Ex. A at ¶ 9.

Throughout the rest of the month of April, S.F. worked to negotiate a relationship with a supply chain company named Al-fajar Al-jadeed ("AA") through his connection with a friend and former business colleague known as Mr. Abed. Ex. A at ¶¶ 10–11. The key advantage of AA was that it could purchase the needed electrical cables from Turkey, a more stable economic market than those relied upon by the initial supplier. *Id.* To facilitate this transaction, S.F. planned to travel to Turkey in May 2006 to establish a line of credit that AA could use to purchase supplies. Ex. A at ¶ 11. Before he left, a lunch meeting was arranged between S.F., Mr. Abed, and someone from the Turkish commercial consul's office with S.F.'s intention to formalize the business arrangement with his friend before leaving the country. Ex. A at ¶ 12.

That lunch meeting was to take place on May 11, 2006 at AA's offices, but S.F. was taken hostage on his way there. Ex. A at ¶¶ 12–13.

Under the legal standard recited by this Court, "an employee is acting within the scope of his employment if the 'purpose of the act is, at least in part, to further the employer's business and if the act is not unexpected in view of the employee's duties.'" ECF No. 30 at 1–2 (quoting *Davis v. Megabus Ne. LLC*, 301 F. Supp. 3d 105, 110 (D.D.C. 2018)). One of S.F.'s primary duties under the MATOC was supply chain management—ensuring that his operations teams had the supplies necessary to complete their jobs on time and on budget. Ex. A at ¶¶ 5, 9. Prior to May 11, 2006, he had been working hard to secure a relationship with AA to ensure that future work on the MATOC, including the substantial work called for under Task Order 0003, would be completed in a timely and cost-effective manner. Ex. A at ¶¶ 10–11.

The lunch meeting with S.F.'s friend was intended to formalize a business relationship, and therefore S.F. was acting in furtherance of his employer's business as he was driving to that meeting. Accordingly, S.F. was acting within the scope of his employment under United States Contract Number W91GXY-06-D-0003 when he was taken hostage.

Respectfully submitted,

_/s/ Kevin A. Hoffman_
Kevin A. Hoffman, Esq. (DC Bar No. 1044559)
Randy D. Singer, Esq. (DCD Bar No. VA0157)
SINGER DAVIS, LLC
1209A Laskin Road
Virginia Beach, VA 23451
Phone: (757) 301-9995
Fax: (757) 233-1084
Email: kevin.hoffman@singerdavis.law
Email: randy.singer@singerdavis.law
*Counsel for Plaintiffs*