# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| W.A., *et al.*, | |
| Plaintiffs | |
| v. | Civil Action No. 18-1883 (CKK) |
| Islamic Republic of Iran, *et al.*, | |
| Defendant | |

## MEMORANDUM OPINION
(December 16, 2019)

This case arises from the kidnapping, torture, and murder of S.F.in Baghdad, Iraq in May 2006. The estate and family members of the deceased claim that he was kidnapped, tortured, and murdered by the Badr Organization of Reconstruction and Development ("Badr Organization"). Proceeding under the Foreign Sovereign Immunities Act ("FSIA"), Plaintiffs allege that Defendant the Islamic Republic of Iran ("Iran") formed, trained, funded, supplied, and directed the Badr Organization and accordingly should be held liable for the kidnapping, torture, and death of S.F. The Court agrees.

Iran has not answered or otherwise participated in this litigation. The case accordingly proceeded in a default setting. The Court held a liability hearing on December 5, 2019. Upon consideration of the pleadings, the relevant legal authorities, and the record as a whole, the Court now determines that Plaintiffs have established their claims by evidence satisfactory to the Court. Accordingly, the Court will GRANT default judgment against Iran as to all Plaintiffs with the exception of Plaintiff B.S. The Court has made findings as to the effects of S.F.'s kidnapping, torture, and murder on Plaintiffs. The Court will refer the issue of specific money damages to Magistrate Judge Michael Harvey.

# I. BACKGROUND

Plaintiffs filed this lawsuit on August 10, 2018. Compl., ECF No. 1. On the Court's order, between August 2018 and May 2019 Plaintiffs filed a series of status reports updating the Court on their efforts to effectuate service on Iran. ECF Nos. 11, 17, 21, 24.[1] On May 10, 2019, Plaintiffs filed a Status Report informing the Court that they had completed service through foreign mailing and diplomatic service. ECF No. 24. Plaintiffs requested entry of default which was granted by the Clerk of the Court on May 10, 2019. ECF No. 25.

The Court held a liability hearing on December 5, 2019, at which Plaintiffs offered documentary evidence, and presented the testimony of fact and expert witnesses. The two fact witnesses were Plaintiffs M.S. and S.S., S.F.'s two eldest sons. The two expert witnesses were Stuart Bowen and Michael Pregent, both senior fellows on intelligence operations in the Middle East with the Hudson Institute. This hearing primarily concerned Defendants' liability. However, the two fact witnesses also presented evidence as to their damages. The remaining Plaintiffs have filed affidavits as to their damages.

# II. LEGAL STANDARD

The entry of default judgment is governed by Federal Rule of Civil Procedure 55. "The determination of whether a default judgment is appropriate is committed to the discretion of the trial court." *Hanley-Wood LLC v. Hanley Wood LLC*, 783 F. Supp. 2d 147, 150 (D.D.C. 2011) (citing *Jackson v. Beech,* 636 F.2d 831, 836 (D.C. Cir. 1980)). Before granting default judgment, the Court must satisfy itself of its jurisdiction, and "[t]he party seeking default judgment has the

---

[1] Plaintiffs initially included two additional Defendants in their lawsuit, Hadi al-Amiri and Baqir Jabr al-Zubeidi. But, Plaintiffs voluntarily dismissed both Defendants, leaving only Iran. ECF No. 26.

burden of establishing both subject matter jurisdiction over the claims and personal jurisdiction over the defendants." *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 33 (D.D.C. 2016).

Under the FSIA specifically, this Court cannot enter default judgment against a foreign state "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *see Roeder v. Islamic Republic of Iran,* 333 F.3d 228, 232 (D.C. Cir. 2003) ("The court . . . has an obligation to satisfy itself that plaintiffs have established a right to relief."). "[T]he FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide," *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014), and "[u]ncontroverted factual allegations that are supported by admissible evidence are taken as true," *Thuneibat*, 167 F. Supp. 3d at 33.

### III. FINDINGS OF FACT

The following Findings of Fact recount horrific events. They detail the kidnapping, torture, and extrajudicial killing of an Iraqi contractor purposefully targeted because of the services he was performing for the United States. As discussed further below, in addition to expert testimony received by the Court, two of S.F.'s sons, M.S. and S.S., testified at the Court's December 5, 2019 hearing regarding the circumstances surrounding the death of S.F. as well as the effect that his death has had on their lives. The Court appreciates that testifying was extremely difficult for both witnesses, as it required them to publicly revisit what was likely the most tragic event in their lives. The Court further expresses its admiration for the witnesses, both of whom faced extraordinarily difficult circumstances and have gone on to become United States citizens and productive members of our society. Both witnesses explained that, in bringing this lawsuit, they hoped to "honor [their] dad's legacy." Tr. 103: 20-21. They further expressed that they "believe in [the] rule of law" and seek to hold Iran responsible for their father's

3

kidnapping, torture, and untimely death through the United States justice system. Tr. 103: 19. The Court hopes that the results of this lawsuit may provide Plaintiffs some measure of closure moving forward.

## A. The Court's Findings of Fact

The Court's Findings of Fact are based on testimony presented at the liability hearing held in this matter on December 5, 2019, as well as evidence submitted at and prior to that hearing. The Court's findings fall into two overarching categories: (1) the Badr Organization and Iran's material support for it, and (2) how that support resulted in the kidnapping, torture, and death of S.F.

### 1. Iran's Material Support for the Badr Organization

The Court finds that Iran provided material support to the Badr Organization throughout the relevant time period. In making this determination, the Court considers the testimony of experts Stuart Bowen and Michael Pregent as well as the expert affidavit of Mr. Bowen. Having considered the requirements set forth in Federal Rule of Evidence 702 for the admission of expert testimony, at the December 5, 2019 hearing, the Court qualified Mr. Bowen as an expert in the following areas: Iraqi politics after the overthrow of Saddam Hussein, including Iraqi political factions and the influence of the Shia militias; the history of the Shia militia insurgencies in post-invasion Iraq; and Iranian influence in Iraq, particularly through the Badr Organization. Tr. 174: 17-25. The Court also qualified Mr. Pregent as an expert in the following areas: Shia militias in Iraq, including the Badr Organization; and Iranian influence within the Iraqi government following the fall of Saddam Hussein in 2003. Tr. 210: 9-15.

Originally called the Badr Brigade, the Badr Organization was founded by Hadi al-Amiri in 1982 as the military wing of the Supreme Council of the Islamic Revolution in Iraq ("SCIRI").

Expert Affidavit of Stuart Bowen, ECF No. 29-1, ¶ 15. Al-Amiri had dual citizenship with Iraq and Iran. Tr. 178: 17-18. Initially, Al-Amiri and the Badr Organization fought for Iran against Iraq in the Iran-Iraq War from 1981 through 1988. Expert Affidavit of Stuart Bowen, ECF No. 29-1, ¶ 17; Ex. 13, Colonel Joel D. Rayburn et al., The U.S. Army in the Iraq War: Volume 1 2003-2006 14 (2019) (explaining that the Badr Organization was "[f]ormed by the Iranian regime during the Iran-Iraq war"). The Badr Organization received support from SCIRI and its leader, who was exiled in Iran. Expert Affidavit of Stuart Bowen, ECF No. 29-1, ¶ 17. The Badr Organization was further "funded, equipped, trained, and initially led by Iran." Id. at ¶ 37. All members of the Badr Organization must swear loyalty to the Supreme Leader Ayatollah Khomeini of Iran. Tr. 178: 5-7.

Following the end of the Iran-Iraq war, the Badr Organization supported efforts within Iraq to overthrow Saddam Hussein and the Sunni ruling class. Iran continued to provide support to the Badr Organization in these efforts. Ex. 13, Colonel Joel D. Rayburn et al., The U.S. Army in the Iraq War: Volume 1 2003-2006 181 (2019). Iran directly sponsored the Badr Organization's activities in Iraq, including the gathering of intelligence and acts of sabotage and subversion in the Shia South of Iraq. Id. at 14.

In 2003, a coalition army, led primarily by the United States, invaded Iraq and ended the rule of Hussein. During this time, the Badr Organization attempted to take advantage of Hussein's overthrow and the power vacuum which remained. The Badr Organization developed lists of Hussein loyalists to target and organized death squads to hunt and kill Sunni leaders as well as Shias who collaborated with the United States and its allies. Id. at 125-26. Iran continued to fund and support the Badr Organization during this time. Expert Affidavit of Stuart Bowen, ECF No. 29-1, ¶ 37.

While Iran saw advantages to the fall of Hussein and his Sunni ruling majority, Iran intoned that "it was unlikely that the United States would establish a new Iraqi Government friendly to Iran." Ex. 13, Colonel Joel D. Rayburn et al., The U.S. Army in the Iraq War: Volume 1 2003-2006 187 (2019). "To Iranian eyes, if the United States retained a close relationship with a democratic Iraq, the new Iraq might become an American platform for targeting the Iranian regime." *Id.*; Tr. 176: 11-13 ("I think the strategy from Iran was to establish a Shia crescent across the norther Middle East from Persia, Iran, through Iraq"). In order to prevent a new Iraqi government from allying itself closely with the United States, Iran developed a strategy to tie itself closer to Iraq while simultaneously separating Iraq from the United States. *Id.* "This strategy involved creating instability inside Iraq, placing the responsibility for the chaos on the United States and its Iraqi partners, and ensuring pro-Iranian politicians dominated the new Iraqi Government." *Id.* In order to further this strategy, Iran supported Shia political parties and militias, such as the Badr Organization. *Id.* Through its long-standing relationship with the Badr Organization, Iran already had an extensive support network within Iraq which was used to sow instability and hinder the United States' efforts at reconstruction. *Id.*

Iran was particularly successful in infiltrating Iraqi law enforcement, including the local, national, and special police, through Bayan Jabr in his position as head of the Ministry of the Interior ("MOI"). Tr. 226: 11-12 (explaining that "the Ministry of Interior continues to this day to be a Badr entity"). Jabr had been a member of the Badr Organization since its inception. He fought for Iran during the Iran-Iraq war and is a dual citizen of Iran and Iraq. Tr. 172: 22-23; 178: 23-25. As head of the MOI, Jabr cleared the MOI of any Sunni leaders, killing many of them. Tr. 182: 1-12. Jabr further brought many of his Badr Organization associates "to work for him in the Ministry of the Interior and many of them carried out his lethal and illegal business."

Tr. 172: 24-173: 1. Under Jabr, the MOI developed special police forces that formed death squads and killed Sunnis as well as Shias who were working with the United States. Tr. 184: 1-16; Expert Affidavit of Stuart Bowen, ECF No. 29-1, ¶ 22 ("Iraqi leaders later related to me that Minister Bayan Jabr approved the torture and killing that occurred under the MOI's aegis"). In addition to killing, the MOI also engaged in torture and "the use of power drills was infamously associated with the [MOI's] torture." Tr. 190: 5-7.

During the relevant period, Iran continued to exert its influence over the MOI through the Badr Organization. Iran trained Badr Organization members in Iran. Tr. 186: 12; Ex. 13, Colonel Joel D. Rayburn et al., The U.S. Army in the Iraq War: Volume 1 2003-2006 392 (2019). Following training, some members were sent back to Iraq to work with Jabr in the MOI. Tr. 186: 13-17. Additionally, Iran provided weapons to the Badr Organization. Tr. 186: 18-19. Throughout this time, there was "direct Iranian influences over Iraqi-Shia militant activities," including over the activities of the Badr Organization. Expert Affidavit of Stuart Bowen, ECF No. 29-1, ¶ 35.

Many of the attacks on Sunnis and Shia Iraqis working with the United States throughout the relevant period were directed by Iran through its influence over the MOI and the Badr Organization. While Iran did not launch direct attacks in Iraq, its support for the Badr Organization allowed it to "exact revenge on Sunni leaders and manipulate the new Iraqi Government." Ex. 13, Colonel Joel D. Rayburn et al., The U.S. Army in the Iraq War: Volume 1 2003-2006 392 (2019). Iran operated with the goal of exerting its influence over Iraq and weakening the United States' power in Iraq.

## 2. The Badr Organization, Materially Supported by Iran, Kidnapped, Tortured, and Killed S.F.

Next, the Court finds that the Badr Organization, supported by Iran, is responsible for the kidnapping, torture, and death of S.F.

During the relevant time period, S.F. owned and operated a contracting company based in Baghdad, Iraq. Dec. of M.S., ECF No. 29-2, ¶ 9. S.F.'s family, who are Sunni Muslims, were actively involved in his company. In addition to being medical doctors, S.F.'s two eldest sons, M.S. and S.S., worked at the contracting company with S.F. *Id.* at ¶ 13; Dec. of S.S., ECF No. 29-4, ¶ 7. His third son, B.A., worked with the engineering team at S.F.'s company. Dec. of B.A., ECF No. 29-6, ¶ 7. And, S.F.'s youngest son, S.A., had a paid internship with the company. Dec. of S.A., ECF No. 29-5, ¶ 8.

In 2003, following the fall of Hussein, the company began working with the Coalition Provisional Authority, particularly the United States, to assist in the rebuilding of Iraq. Dec. of M.S., ECF No. 29-2, ¶ 14. S.F. and his family knew that it could be dangerous to work with the United States based on the antipathy some Iraqis felt towards the United States. Tr. 23: 20-25. Nevertheless, S.F. decided to take on this work because "he believed this [was his] opportunity to rebuild the country, [and] help the Americans to establish … a democratic system." Tr. 23: 8-10.

S.F.'s company began its work with the United States by constructing a new building for the Commission on Public Integrity ("CPI"). The purpose of the CPI was to target bad practices and corruption in the Iraqi government. Tr. 24: 11-15. S.F.'s company built two projects for the CPI. S.F. "believed that it [was] a good legacy for him to engage with [anti-corruption], even though [he would] not have any profit" from the projects. Tr. 24: 16-20. These projects were built inside the green zone in Baghdad, and S.F.'s participation in the construction, as well as the

purpose of the buildings, was known to few. Tr. 25: 6-26: 2. One department in the Iraqi government knew of S.F.'s role in the projects—the Ministry of Housing and Reconstruction. Tr. 26: 24-25. The head of the Ministry of Housing and Reconstruction at the time was Jabr, a known member of the Badr Organization who later became the head of the MOI. 27: 7-13.

Because S.F.'s company successfully and timely completed their work for the CPI, S.F. was encouraged to apply for other contracts with the United States. Tr. 31: 10-15. Ultimately, S.F.'s company was given a multiple award task contract to complete reconstruction work in Iraq on behalf of the United States. Tr. 31: 20-23; Ex. 1 (multiple award task order contract). Under the contract, S.F.'s company was given multiple tasks in furtherance of the reconstruction effort. Each task was valued at a certain amount of money, and if the task was completed on time, the company would be compensated and could move to the next task. Tr. 33: 7-18. The tasks primarily related to rebuilding and refurbishing the electricity grid in Baghdad. Tr. 33: 21-22.

S.F.'s company began working on the multiple award task contract with the United States in early 2006. The year 2006 was a particularly bad time for sectarian violence in Iraq. Expert Affidavit of Stuart Bowen, ECF No. 29-1, ¶ 21. During this time, the situation in Baghdad was volatile due to the bombing of one of the holiest Shia sites. *Id.* at ¶ 34. Attacks between Shias and Sunnis escalated as did attacks on United States personnel. *Id.* S.F.'s work on the electrical grid was particularly dangerous because Iran, through militias including the Badr Organization, was attempting to sabotage the United States' reconstruction work in Iraq. *Id.* at ¶ 35; Tr. 40: 9-15. S.F. was aware of this increase in violence and took precautions in an attempt to secure the safety of his workers, his family, and himself. Tr. 38: 23-39: 25.

Despite these precautions, shortly after beginning work on the electrical grid, one of S.F.'s chief engineers was kidnapped by the Badr Organization. Tr. 40: 25, 44: 11-16; Ex. 9

(emails regarding kidnapping). Witnesses reported that the kidnappers were wearing clothing with an emblem on their shoulders identifying them as part of the Badr Organization. Tr. 47: 11-19. After paying a ransom, the engineer was eventually released. Tr. 44: 6-10. The engineer was told that "if he continue[d] to work on the electricity grid he [would] lose his life and his family's life as well." Tr. 44: 8-10. The engineer quit and moved his family from Iraq. Tr. 44: 18-19. Importantly, the engineer was Christian, creating an inference that he was targeted for his work with the United States rather than based on sectarian violence. Tr. 41: 6-8. In addition to the kidnapping, a car bomb was set off near the company's offices. Tr. 48: 10-16; Ex. 10 (emails relating to the car bomb). Again, the car bomb was linked to the Badr Organization's attempt to force S.F.'s company to stop working with the United States. Tr. 50: 4-11.

Despite these attacks, S.F. and his family decided "to move forward … with the projects and help the Americans." Tr. 45: 4-5; Ex. 9 ("we still want to work with you in[ ]spite of all the risks taken"). However, the company continued to take more steps in an attempt to make the working environment safer. Tr. 45: 17-23.

Due to the sectarian violence and continued disruptions in Iraq, in April 2006, S.F. realized that he would require another supplier in order to have secured access to the materials needed to rebuild the electricity grid. Tr. 53: 2-11. S.F. contacted his longtime friend, Abu Ali, for assistance in locating a new supplier for the materials. Tr. 54: 8-10. Ali worked with Turkish companies who could access safer routes to deliver the necessary materials. Tr. 55: 3-16. In late April 2006, S.F. and Ali began negotiations for a contract for these supplies. Tr. 55: 17-21.

On May 11, 2006, the date of S.F.'s kidnapping, S.F. planned to meet Ali for lunch at Ali's office in order to finalize an initial agreement for the materials. Tr. 55: 22-56: 4. Following the morning at work, S.F. sent his son, M.S., home so that S.F. could go to lunch with Ali and a

Turkish representative. Tr. 56: 8-19. M.S. took a taxi home and left the family car with S.F. so that he could drive to his lunch at Ali's office. Tr. 57: 20-21; Supplemental Dec. of M.S., ECF No. 31-1, ¶¶ 10-13.

S.F.'s family first became concerned when he did not arrive home at his usual time in the late afternoon. Tr. 58: 3-5. S.F.'s family repeatedly called his cellphone, but S.F. did not answer. Tr. 58: 11-13. The family then called Ali, but Ali reported that S.F. had failed to show up for lunch. Tr. 58: 16-17. M.S. worried that S.F. had gotten into a car accident on the way to Ali's office and began calling the hospitals. Tr. 58: 18-24.

M.S. asked Ali to send one of his workers to check near the office to see if an accident had occurred. Tr. 59: 6-8. Ali later told the family that S.F. had been stopped at a police check point and had been taken. Tr. 59: 11-13. Ali learned this information by walking the streets and asking shop owners if they had seen anything. Tr. 63: 1-7.

Late on the evening of May 11, 2006, S.F.'s family continued making calls to his cellphone. Eventually, someone picked up S.F.'s cellphone and stated that they had S.F. The person further instructed that he would call back and that the family should stop calling S.F.'s cellphone. Tr. 59: 18-21.

After learning that S.F. had been kidnapped, his family was in shock. Tr. 60: 24-25. S.S., the eldest brother, divided responsibilities among the family. S.S. was responsible for communication with the kidnappers. M.S. and B.A. were responsible for continuing the work that the company was doing. And, S.A. was responsible for supporting W.A., S.F.'s wife and the sons' mother. Tr. 61: 8-19, 115: 19-23. The family did not report the kidnapping to the Iraqi authorities; however, they did report it to the United States authorities. But, the United States failed to provide S.F.'s family with any real help. Tr. 63: 16-64: 11.

The kidnappers continued to call S.F.'s family for the next three days. S.S. took these calls; however, other family members were often present and could overhear the calls. Tr. 65: 7-15. During the calls, the kidnappers cursed at the family and made threats. Additionally, they tortured S.F. so that his family could hear his screams over the phone. Tr. 65: 21-66: 9. The kidnappers requested ransom money. Importantly, they also instructed the family to quit working for the United States. Tr. 66: 10-17. The kidnappers further requested that the family provide them with the work documentation from S.F.'s company as it related to their contracts with the United States. Tr. 66: 14-21.

The kidnappers knew about S.F.'s "family, M.S., details about [their] work, jobs, [the] brothers, the addresses, the cars, model, everything." Tr. 124: 2-5. Additionally, the kidnappers spoke with an accent that S.S. recognized as Iranian. Tr. 124: 15-23. As further evidence of the kidnappers' identities, on one call, the kidnapper threatened that S.F. would be "shipped to Iran and get killed for cooperating with the – they call the United States the Big Satan." Tr. 125: 6-10.

The day following the kidnapping, the kidnappers called S.S. and demanded a ransom. Tr. 118: 15. The kidnappers asked for $400,000 United States dollars. Tr. 118: 17. S.S. informed the kidnappers that so much money would be impossible to gather. But, the kidnappers showed that they had knowledge of the company's contracts with the United States. The kidnappers replied that $400,000 was the value of the last subcontract S.F.'s company had completed for the United States. Tr. 119: 7-14. The kidnappers' knowledge shocked S.S. because "only a very narrow circle of us knew the values of the subcontracts." Tr. 119: 12-14. The kidnappers further instructed S.S. that his family should cease working with the United States. Tr. 120: 8-12.

Additionally, on the day following the kidnapping, the kidnappers instructed S.F.'s family to go to the police station to retrieve his vehicle. The police station was close to the MOI

headquarters. Tr. 67: 12-16. Following the call, M.S. and S.S. went to the police station to retrieve the vehicle. The police stated that they had taken the car believing that it was a car bomb. Tr. 68: 15-20. However, M.S. did not credit this explanation because there was no evidence that the car had been searched or towed. Tr. 69: 5-13.

The next day, two days after the kidnapping, the kidnappers called S.S. and took a "bad cop/good cop kind of approach." Tr. 121: 5-6. One kidnapper would call and scream and curse and torture S.F. so that S.S. could hear his screams. Tr. 121: 6-9. Throughout the day, S.S. received multiple calls where he could hear S.F. being tortured and hit with a hard object. Tr. 121: 19-122: 23. Then, another kidnapper would call back and in a calmer tone "tr[y] to be the sound of reason with [S.S.]." Tr. 121: 12-14.

In the midst of these calls, S.S. was able to speak with S.F. In order to speak with his father, S.S. told the kidnappers that he needed assistance with accessing the money for the ransom payment. Tr. 127: 18-25. Over the phone, S.F. sounded hurt, tired, and afraid. Tr. 128: 2-4. However, S.F. was able to send S.S. a coded message through the conversation in order to help S.S. identify the kidnappers. S.S. asked S.F. for assistance in finding the funds for the ransom. S.F. instructed S.S. to go to a mutual acquaintance in the neighborhood, Ali Qwizny, for help. Tr. 128: 11-23. Qwizny was not a friend of S.S. or S.F. Instead, he was a known figure in the neighborhood who was one of the leaders of the Badr Organization. Tr. 128: 25-129: 5. Qwizny came to Iraq after the Iran-Iraq war and was a dual citizen of Iran and Canada. Tr. 129: 8-11. S.F. had always instructed S.S. to avoid Qwizny. Tr. 129: 12-16. S.S. interpreted S.F.'s instruction to seek out Qwizny "as a very obvious message that [S.F. was] in the hands of the Badr Organization, in the hands of Iranians, because of the way that [S.F.] phrased it, he repeat[ed] that three times." Tr. 130: 2-7.

Also on that day, S.F.'s family was instructed to go to the MOI headquarters. Tr. 70: 1-4. M.S. and S.S. went to the MOI headquarters. Inside the MOI headquarters were militia members wearing the insignia of the Badr Organization. Tr. 82: 13-21. M.S. testified that civilians, not wearing law enforcement clothing, met them. Tr. 70: 15-20. Additionally, the MOI civilians spoke with an accent which the brothers believed to be Iranian. Tr. 70: 21-23, 71: 16-21. The MOI civilians did not ask about S.F.'s disappearance but they did ask about S.F.'s work with the United States and requested access to the company's contracts and files. Tr. 70: 24-71: 5. The accents of the MOI civilians as well as the requests for the company's documents, led M.S. and S.S. to believe that S.F. had been kidnapped by an Iranian-backed militia. Tr. 72: 4-6.

On the fourth day following the kidnapping, S.S. and the kidnappers had agreed on a ransom of $150,000 United States dollars. Tr. 73: 4-5. To raise that amount of money, S.F.'s family was forced to take all their money from the banks, borrow money from friends, and liquify assets. Tr. 73: 9-16. While the family was split as to whether or not to pay the ransom, they eventually agreed that S.S. would meet the kidnappers and pay the ransom. Tr. 74: 10-11. S.S. sought assurances from the kidnappers that S.F. would be returned. The kidnapper stated "I swear to you with Allah, with Omar, whom you Iraqis believe in, I will let your dad go safely if you drop the money." Tr. 132: 1-3. The phrasing of this promise struck S.S. because if the kidnapper had been Iraqi he would have associated only the Sunnis with Omar rather than claiming that all Iraqis believe in Omar. According to S.S., this comment showed "beyond any doubt that [S.F. was] in Iranians' hands." Tr. 132: 6-8.

Eventually, the kidnappers agreed to bring S.F. to the drop-off where S.S. would deliver the ransom. Tr. 132: 16-18. S.S. contacted his uncle who pretended to be a taxi driver so that he could drive S.S. to the drop-off and offer support. Tr. 135: 12-19. The kidnappers gave S.S. a

series of instructions which ultimately led him to an alley. S.S. was instructed that he would find S.F. in the alley and that he should leave the ransom payment there. Tr. 138: 10-15. Upon entering the alley, S.S. realized that S.F. was not there. Immediately two cars pulled up to the alley. One entered the alley and hit S.S. Tr. 140: 2-8. The second car was a police vehicle which blocked the street so that no one else could enter. Tr. 140: 9-11.

Someone exited the first car with a gun. Tr. 141: 1-4. S.S. ripped the bag which contained the money and threw it to the ground as a distraction. Tr. 141: 10-14. This distraction gave S.S. enough time to jump over the wall of the alley, narrowly avoiding two bullets. Tr. 142: 5-8. S.S. continued running and eventually was able to call his uncle who picked him up. Tr. 143: 7-10. S.S. also called M.S. and informed him that the ransom payment had not been successful. Tr. 144: 11-15.

Following the failed attempt at a ransom payment, M.S. believed that his father was dead. Tr. 75: 3-5. At that time in Baghdad, many dead bodies were left on the streets and eventually brought to the morgue. Tr. 75: 15-24. So, M.S. contacted a friend who worked in the city morgue. Tr. 76: 20-25. Due to unusual levels of police and militia activity in the morgue, M.S. met his friend outside the morgue and his friend allowed him to use his lab coat and identification badge to enter the morgue through the back. Tr. 78: 18-21. At the morgue, M.S. recognized a picture of his father. M.S. and his friend retrieved S.F.'s body and smuggled the body out of the morgue. Tr. 79: 8-18.

M.S. took S.F.'s body to a mosque near the family home. His brothers met him there so that they could wash and clean the body to prepare it for W.A. to see. Tr. 80: 1-4. The body showed evidence of torture, including drill wounds in nonlethal areas, a signature of the Badr Organization. Tr. 190: 5-7 ("the use of power drills was infamously associated with the [MOI's]

torture"). There were also burn marks that M.S., as a medical doctor, could identify as occurring prior to death. Tr. 80: 8-12. Additionally, S.F. had multiple fractured ribs and bruising all over his body. His tibial bone was broken. Tr. 80: 25. Finally, there was a bullet wound in the back of S.F.'s head. Tr. 81: 7-9, 146: 19-147: 9. The bullet did not go through S.F.'s skull which caused his face to be deformed and swollen. When S.F. was returned to the house, W.A. saw S.F.'s injured face and went into shock and hysteria. Tr. 81: 7-16. S.F. was ultimately buried in his ancestral home outside Baghdad. Tr. 150: 13-21.

Initially, the family was not in agreement as to whether or not the business should continue. Tr. 83: 13-14. Following S.F.'s death, his family continued to receive threats and there were significant attacks on the company. Tr. 83: 13-25. At the worksite, the workers were threatened. The workers reported that the threats came from the Badr Organization, which was recognizable due to the presence of the Badr Organization insignia on the attackers' clothing and cars. Tr. 83: 18-25. The attackers told the workers not to continue working for the company or they would be killed. Tr. 83: 20-21. Members of the Badr Organization, wearing the insignia, also attacked the company's office by shooting guns into the air, threatening people, and trashing computers. Tr. 84: 9-15. S.F.'s family continued to receive threats and were even shot at from a distance. Tr. 85: 18-23. As workers quit due to the threats and violence, it became more difficult to run the company. Within two to three months, S.F.'s family decided to close the company and terminate the remaining contracts. Tr. 84: 1-8. S.F.'s family was forced to liquify all their assets in an attempt to pay their employees their remaining paychecks. Tr. 85: 4-13.

After closing the business, S.F.'s family abandoned their home and fled as refugees to Jordan in November 2006. Tr. 86: 9-13. After S.F.'s family fled, members of the Badr Organization went to the family house, trashed it, and threatened the neighbors "to see what

16

happened if [they] aligned with the Americans." Tr. 89: 20-23. One of the neighbors surreptitiously took pictures showing the ransacked house and the invaders. Tr. 89: 24-25; Ex. 11 (picture of the house). In the picture, those ransacking the house include men in blue police uniforms as well as civilians in green and camouflage representing the Badr Organization. Tr. 91: 16-21; Ex. 11.

## IV. CONCLUSIONS OF LAW

The Court's Conclusions of Law proceeds in four parts. First, the Court concludes that it has subject matter jurisdiction over Plaintiffs' claims pursuant to the FSIA's terrorism exception. Second, the Court finds that Plaintiffs have satisfactorily established their claims for relief under the District of Columbia cause of action for intentional infliction of emotional distress. Third, the Court concludes that it has personal jurisdiction over Defendant Iran. Finally, the Court refers the question of specific money damages for further proceedings before a Magistrate Judge.

### A. Subject Matter Jurisdiction

First, the Court concludes that it has subject matter jurisdiction over Plaintiffs' claims. "The FSIA provides a basis for asserting jurisdiction over foreign nations in the United States." *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 87 (D.C. Cir. 2002). Pursuant to the FSIA, the Court has "original jurisdiction" over "nonjury civil action[s]" against foreign states "without regard to amount in controversy" if the claims seek "relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement." 28 U.S.C. § 1330(a).

Most of these elements are clearly satisfied in this case and require little discussion. Plaintiffs do not demand a jury trial, the only Defendant is Iran—a foreign state, and Plaintiffs seek in personam relief against Iran.

The question of Iran's immunity is more involved.  "[A] foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state."  *Saudi Arabia v. Nelson,* 507 U.S. 349, 355 (1993).  "[E]ven if the foreign state does not enter an appearance to assert an immunity defense, a District Court still must determine that immunity is unavailable under the [FSIA]."  *Verlinden B.V. v. Cent. Bank of Nigeria,* 461 U.S. 480, 493 n.20 (1983).  In this case, Plaintiffs claim that the FSIA's terrorism exception to foreign sovereign immunity applies.  That exception states that:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1).  Additionally, for this exception to apply, the foreign state defendant must have been designated a state sponsor of terrorism at the time of the act and remain so-designated when the claim was filed or in the preceding six months, § 1605A(a)(2)(A)(i); the claimant or the victim in the case must have been a national of the United States, a member of the Armed Forces or otherwise employed by the United States, § 1605A(a)(2)(A)(ii); and "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant [must] afford[ ] the foreign state a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration." § 1605A(a)(2)(A)(iii).

Again, some of these elements are clearly satisfied and require little discussion.  Iran has been designated as a state sponsor of terrorism at all relevant times, U.S. Dep't of State, *State Sponsors of Terrorism*, https://www.state.gov/j/ct/list/c14151.htm (last visited December 13,

2019); and the killings at issue did not take place in Iran, meaning Plaintiffs had no obligation to afford Iran an opportunity to arbitrate.

The second additional element—the identity of the victim—requires additional discussion. At the time of the terrorist act, Plaintiffs must show that S.F. was performing a United States government contract and that he was acting within the scope of that employment. 28 U.S.C. § 1605A(a)(2)(A)(ii)(III). At the time of his kidnapping, torture, and killing, S.F. was performing work on a contract for the United States. *See* Ex. 1 (multiple award task order contract), Tr. 31: 12-15; Dec. of M.S., ECF No. 29-2, ¶ 19.

Additionally, at the time of the kidnapping, and eventual torture and killing, S.F. was "acting within the scope" of his contract. In determining if an employee is acting within the scope of employment, courts in the District of Columbia follow the Restatement (Second) of Agency. *Doe v. Sipper*, 821 F. Supp. 2d 384, 388 (D.D.C. 2011).[2] The Restatement explains that an employee's act is within the scope of employment if the act "(a) [] is one of the kind he is employed to perform; (b) [the act] occurs substantially within the authorized time and space limits; [and] (c) [the act] is actuated, at least in part, by a purpose to serve the master…." *Id.* (quoting Restatement (Second) of Agency § 228(1)(a)-(c) (1958)). In other words, an employee is acting within the scope of his employment if the "purpose of the act is, at least in part, to further the employer's business and if the act is not unexpected in view of the employee's duties." *Davis v. Megabus Ne. LLC*, 301 F. Supp. 3d 105, 110 (D.D.C. 2018) (quoting *Floyd-Mayers v. Am. Cab Co*., 732 F. Supp. 243, 246 (D.D.C. 1990)).

---

[2] For reasons that will be explained later in this Memorandum Opinion, the Court concludes that District of Columbia law applies in this case. *See Supra* Sec. IV.B.

Plaintiffs have provided evidence that, at the time of his kidnapping, S.F. was en route to a business lunch in order to secure a supply chain to purchase electrical cables from Turkey in order to complete a contract involving the large-scale installation of electrical cables. Supp. Dec. of M.S., ECF No. 31-1, ¶¶ 4-12; Tr. 57: 22-25. Because S.F. was kidnapped while he was attempting to secure access to materials in order to fulfill his contract with the United States government, the Court finds that S.F. was kidnapped, tortured, and killed while acting within the scope of his employment pursuant to a contract awarded by the United States government. The Court also considers that the motivation for kidnapping, torturing, and killing S.F. was directly related to his contract work with the United States government. Evidence has been presented that S.F. was targeted because he agreed to work with the United States to rebuild Iraq's electrical grid. Dec. of M.S., ECF No. 29-2, ¶¶ 26, 35; Dec. of W.A., ECF No. 29-3, ¶ 20; Expert Affidavit of Stuart Bowen, ECF No. 29-1, ¶ 35; Tr. 194: 8-17 (expert opinion that S.F. was killed because of his work with the United States).

More analysis is also required to determine whether the personal injury and death in this case was caused by "torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act." 28 U.S.C. § 1605A(a)(1). Plaintiffs assert that S.F. was taken hostage, was tortured, and was extrajudicially killed. Plaintiffs further assert that these acts were caused by Iran's material support for the Badr Organization. The Court concludes that Plaintiffs have presented satisfactory evidence to support each of these assertions.

Under the FSIA, the term "hostage taking" has the meaning given to it by Article 1 of the International Convention Against the Taking of Hostages ("ICATH"). 28 U.S.C. § 1605A(h)(2). With respect to "hostage taking," the ICATH states that:

> Any person who seizes or detains and threatens to kill, to injure or to continue to detain another person … in order to compel a third party, namely, a State, an international intergovernmental organization, a natural or juridical person, or a group of persons, to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage commits the offence of taking of hostages.

International Convention Against the Taking of Hostages, Dec. 17, 1979, Article I, U.N. 21931.

And, under the FSIA, the terms "extrajudicial killing" and "torture" have the meanings given to them in section 3 of the Torture Victim Protection Act of 1991 ("TVPA"). 28 U.S.C. § 1605A(h)(7). With respect to "extrajudicial killing," the TVPA states that:

> For the purposes of this Act, the term "extrajudicial killing" means a deliberate killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

Torture Victim Protection Act of 1991, Pub. L. No. 102-256, § 3(a), 106 Stat. 73. With respect to "torture," the TVPA states that:

> (1) the term "torture" means any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind; and
>
> (2) mental pain or suffering refers to prolonged mental harm caused by or resulting from—
>
>> (A) the intentional infliction or threatened infliction of severe physical pain or suffering;
>> (B) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality;
>> (C) the threat of imminent death; or
>> (D) the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.

Pub. L. No. 102-256, § 3(b), 106 Stat. 73.

First, Plaintiffs have presented evidence satisfactory to the Court that S.F. was the victim of hostage taking by the Badr Organization. Tr. 214: 11-215: 3 (explaining that the method of kidnapping S.F. from a police checkpoint was consistent with the Badr Organization's practice). The Court is satisfied by the evidence presented, as outlined in detail in the Court's Findings of Fact, that S.F. was seized and detained and that members of the Badr Organization threatened to kill and injure him unless his family members provided a money ransom. The abductors provided a series of instructions to S.S. by telephone, including for the payment of a ransom as well as an order that S.F.'s family cease working with the United States and provide the kidnappers with the relevant company documentation for their contracts with the United States. The requests for these company documents relating to S.F.'s work for the United States were repeated by personnel at the MOI headquarters who had connections to the Badr Organization and the Iranians. That the kidnappers were members of the Badr Organization is further evident in S.F.'s delivery of a coded message to S.S. relating to a known Iranian collaborator and Badr Organization member, Ali Qwizny. After a ransom price was agreed on, the kidnappers provided a series of instructions ostensibly leading to the drop-off point where S.F. would be waiting. Ultimately, Plaintiffs delivered the ransom, but still S.F. was not released. Dec. of S.S., ECF No. 29-4, ¶¶ 8-21.

Second, Plaintiffs have presented evidence satisfactory to the Court that S.F. was the victim of an extrajudicial killing by the Badr Organization. Tr. 212: 5-20 (explaining that 2005-2006 was "the extrajudicial killing time in Iraq" perpetrated largely by members of the Badr Organization supported by Iran). The Court is satisfied by the evidence presented, as outlined in detail in the Court's Findings of Fact, that S.F.'s killing was not authorized by a prior judgment

affording judicial guarantees or due process, nor is the deliberate killing of a non-military United States contractor lawful under any international law. It is a quintessential extrajudicial killing. *See Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1050 (D.C. Cir. 2014) ("[w]ith respect to extrajudicial killing, the Kims need demonstrate only that the DPRK killed the Reverend without due process.").

Third, the Court concludes that S.F. was the victim of torture. As outlined in detail above, S.F. was tortured while he was held captive by the Badr Organization. S.S., as well as other Plaintiffs, were regularly forced to listen to S.F.'s screams and requests for mercy over the telephone. Dec. of S.S., ECF No. 29-4, ¶ 16. Additionally, when M.S. and S.S., both medical doctors, recovered their father's body from the morgue, the body was covered with signs of torture and wounds. These wounds included broken bones, bruises, and burns. Additionally, they included injuries consistent with the use of a power drill against the skin, a signature of the Badr Organization. Tr. 190: 5-7 ("the use of power drills was infamously associated with the [MOI's] torture").; Tr. 190: 11-14 (explaining that S.F.'s wounds were consistent with descriptions of torture conducted by the MOI and the Badr Organization).

Finally, the Court is satisfied that Iran provided material support and resources to the Badr Organization, and that the hostage taking, torture, and death at issue was "caused by" this support. The FSIA defines "material support or resources" broadly, as:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1). As outlined in the Court's Findings of Fact, Iran provided material support to the Badr Organization by, among other things, founding the organization, providing

funding, providing weapons, and providing training to the organization taking place mainly at camps in Iran. Expert Affidavit of Stuart Bowen, ECF No. 29-1, ¶ 37 (explaining that the Badr Organization was "funded, equipped, trained, and initially led by Iran"); Tr. 215: 14-15 ("Badr Corps received the most sophisticated training from Tehran"); Ex. 17, March 26, 2007 Tactical Interrogation Report (explaining that members of the Badr Organization received training from Iran). Some members of the Badr Organization who were trained in Iran were sent back to Iraq to work for the MOI. Tr. 186: 12-17. Training included support on "[s]nipper operations; small unit tactics such as raids, ambushes, kidnapping, torture; how to fire rockets, precision rockets; how to fire mortars;" and more. Tr. 220: 23-25. As such, during the relevant time period Iran was providing material support and resources to the Badr Organization. Tr. 202: 3-7 (explaining that reporting indicated that Iran was supporting the Badr Organization).

With respect to the requirement that the kidnapping, torture, killing in this case be "caused by" this material support, "[t]he FSIA's causation requirement is satisfied by a showing of proximate cause." *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 54 (D.D.C. 2008) (citing *Kilburn v. Socialist People's Libyan Arab Jamahiriya,* 376 F.3d 1123, 1128-29 (D.C. Cir. 2004)). "Proximate causation may be established by a showing of a 'reasonable connection' between the material support provided and the ultimate act of terrorism." *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 151 (D.D.C. 2011).

There is far more than a "reasonable connection" between the material support described above and the acts of terrorism in this case. Plaintiffs presented expert testimony that Iran's support for the Badr Organization was provided for the purpose of allowing the Badr Organization to commit precisely the types of terrorist attacks at issue, so as to "creat[e] instability inside Iraq, placing the responsibility for the chaos on the United States and its Iraqi

partners, and [to] ensur[e] pro-Iranian politicians dominated the new Iraqi Government." Ex. 13, Colonel Joel D. Rayburn et al., The U.S. Army in the Iraq War: Volume 1 2003-2006 187 (2019); Tr. 192: 13-16 (explaining that "the Badr Corps was used and indeed controlled by Iran to foment terrorist attacks, destruction, perfidy in Baghdad and beyond from 2004 through 2006 and after"). By kidnapping, torturing, and killing S.F. a key member of the United States' effort to rebuild Iraq's electrical grid, Iran succeeded in its mission of creating chaos in Iraq and weakening the United States. Tr. 180: 7-9 (explaining that Iran, through the Badr Organization, attacked "everything that the United States and the new democracy in Iraq were trying to accomplish through the relief and reconstruction program").

Moreover, there is evidence of direct ties between Iran and the actions of the Badr Organization in kidnapping, torturing, and killing S.F. First, S.F.'s company was not attacked prior to beginning work for the United States. The fact that the company had not previously been subject to sectarian violence is evidence that S.F.'s kidnapping, torture, and murder were perpetrated due to his work for the United States and Iran's mission to sabotage the United States' reconstruction effort in Iraq. Ex. 13, Colonel Joel D. Rayburn et al., The U.S. Army in the Iraq War: Volume 1 2003-2006 187 (2019). The difference between this attack and quotidian sectarian violence is further demonstrated by the initial kidnapping of the company's chief engineer who was a Christian, not a Sunni Muslim.

There is also evidence that Iranians played a direct role in the events. S.S. testified that the kidnappers had Iranian accents. Tr. 124: 15-23. And, M.S. testified that the MOI personnel whom the kidnappers instructed them to meet had Iranian accents. Tr. 70: 21-23; Tr. 222: 13-18 (explaining that Iranians infiltrated the MOI). Furthermore, in a coded message, S.F. signaled to S.S. that the Iranians were responsible for his kidnapping by referencing a well-known

neighborhood figure who was a Badr Organization member and an Iranian citizen. Additionally, when engaging in negotiations, a kidnapper said to S.S. that he swore by Omar "whom you Iraqis believe in." Tr. 132: 1-3. This reference to Iraqis as a group distinct from the kidnappers implies that the kidnappers were not Iraqi. Moreover, the type of torture that was used, particularly the use of a power drill, is a signature torture method used by the Badr Organization and taught by Iran. Tr. 212: 10-12 (testimony that a "[d]rill, power drill, was the way the militias tortured people"); Ex. 27, UN Assistance Mission for Iraq, Human Rights Report: 1 July-31 August 2006 ¶ 65 (2006).

Accordingly, the Court is satisfied that the relationship between the material support Iran provided the Badr Organization and that organization's hostage taking, torture, and killing of S.F. satisfies the FSIA terrorism exception's causation requirement.

Having determined that Iran provided material support to the Badr Organization, and that this support caused the acts of hostage taking, torture, and extrajudicial killing at issue in this case, the Court concludes that it has subject matter jurisdiction over Plaintiffs' claims under the FSIA's terrorism exception.

## B. Liability and Cause of Action

After ascertaining subject matter jurisdiction, the Court must next determine whether or not Plaintiffs have established liability under a cause of action. Often, plaintiffs seeking to establish subject matter jurisdiction pursuant to the FSIA's terrorism exception also seek to establish liability under 28 U.S.C. § 1605A(c). Generally, plaintiffs seek liability under § 1605(A)(c) because "[t]here is almost total overlap between the elements of [§ 1605A(c)'s] cause of action and the terrorism exception to foreign sovereign immunity." *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 86-87 (D.D.C. 2018) (internal quotation marks omitted).

Section 1605A(c) states that state sponsors of terrorism shall be liable "for personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages," in suits brought by four categories of individuals, including nationals of the United States and individuals performing a contract awarded by the United States government, acting within the scope of the contractor's employment. § 1605A(c). In other words, this section creates a cause of action for the same conduct that gives rise to jurisdiction under the terrorism exception.

The Court first considers whether or not recovery under § 1605A(c) is available to the estate of S.F. This cause of action is available to S.F.'s estate because, as set out in the Court's findings of fact, S.F. was an individual performing a contract awarded by the United States Government, acting within the scope of his employment. *See Infra* Sec. IV.A. The estate of a plaintiff who would have had standing to sue "is expressly covered by, and entitled to bring claims under, Section 1605A(c)." *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 78-79 (D.D.C. 2017). And, given the overlap between the elements of this cause of action and the terrorism exception to foreign sovereign immunity, Iran's liability has already been established by the conclusions of law set forth above.[3]

---

[3] The Court notes that even if the estate of S.F. could not recover under § 1605A(c), the estate would still be able to recover under District of Columbia law for the intentional infliction of emotional distress. *See Supra* Sec. IV.B. S.F. was kidnapped and tortured while he remained alive. His family heard his screams over the telephone and there is evidence that S.F. incurred his wounds prior to death. As such, S.F. has a claim that Iran intentionally caused him to suffer severe emotional distress through kidnapping, torture, and eventual death. However, the Court has already determined that S.F.'s estate has a claim under § 1605A(c) and the elements for a solatium claim are indistinguishable from an intentional infliction of emotional distress claim. *See Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 62 (D.D.C. 2018).

The analysis is more complicated for the Plaintiff family members. While all Plaintiffs in this case are now citizens of the United States and would be covered by § 1605A(c), Plaintiffs were not citizens of the United States at the time of the relevant events in 2006. As Plaintiffs admit, "the unique facts of this case, involving family members who obtained U.S. citizenship after the terrorist act, would create a statutory interpretation of first impression." Pls.' Mot., ECF No. 29, 23 n.4.

However, resolving this question of first impression is unnecessary. Instead of looking to § 1605A(c) for their cause of action, Plaintiffs recognize that "[t]he law is well-settled that such family members also have a common law cause of action under District of Columbia intentional infliction of emotional distress law that would provide the exact same relief." *Id.*; *see Fritz*, 324 F. Supp. 3d at 62 (explaining that "the elements of a solatium claim are indistinguishable from an IIED claim"). Accordingly, for Plaintiff family members, the Court will not analyze Iran's liability pursuant to § 1605A(c) and will instead analyze Iran's liability pursuant to District of Columbia common law.

The Court begins by explaining that the creation of a federal cause of action in § 1605A(c) did not revoke Plaintiffs' ability to recover pursuant to state law causes of action. The United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") addressed this precise question in *Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017). In *Owens*, the defendant, Sudan, argued that a plaintiff pursuing relief through the FSIA's terrorism exception "could sue under the new federal cause of action but could no longer press a state-law claim against a foreign sovereign via the pass-through process." 864 F.3d at 808. The D.C. Circuit flatly rejected this argument explaining:

> Of course, in most cases brought under the new terrorism exception, the plaintiff need not rely upon state tort law. This does not, however, imply that the Congress intended to

> foreclose access to state law by those who need it, as do foreign family members. U.S. nationals will continue to sue under § 1605A(c) and benefit from its consistent application. But the pass-through approach remains viable to effectuate the intent of the Congress to secure recoveries for other plaintiffs harmed by a terrorist attack.

*Id.* at 809. Accordingly, the Court concludes that Plaintiffs may rely on state law as the basis of their cause of action against Iran.

Next, the Court will explain why District of Columbia law applies to this case. The Court determines what law applies to a case by applying the choice of law rules of the forum state, in this case the District of Columbia. *Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 841 (D.C. Cir. 2009). The District of Columbia's choice of law rules combine a "governmental interest analysis" with a "most significant relationship test." *Fritz*, 320 F. Supp. 3d at 89 (quoting *Oveissi*, 573 F.3d at 842). Pursuant to the governmental interest analysis, the Court evaluates "the governmental policies underlying the applicable laws and determine[s] which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review." *Hercules & Co., Ltd. v. Shama Rest. Corp.*, 566 A.2d 31, 41 (D.C. 1989). And, under the "most significant relationship test," the Court considers the factors in the Restatement (Second) of Conflict of Laws including "the place where the injury occurred," "the place where the conduct causing the injury occurred," "the domicile[,] … place of incorporation … and place of business of the parties," and "the place where the relationship is centered." *Id.* at 41-42 (citing Restatement (Second) of Conflict of Laws § 145(2) (1971)). Generally, the Court will use the law of the forum state, "unless the foreign state has a greater interest in the controversy." *Owens*, 826 F. Supp. 2d. at 154 (internal quotation marks omitted).

Considering both tests, the Court concludes that the law of the forum state, the District of Columbia, should apply in this case. The United States has a "unique interest" in having its own laws apply in litigation involving acts of terrorism, especially when those acts, such as this one,

are committed to weaken United States' interests and policies abroad. *Id.* at 154-55.

"Furthermore, in light of the 2008 amendments to FSIA that seek to promote uniformity and extend access to U.S. federal courts to foreign national immediate family members of victims of terrorism, the law of the forum state, the District of Columbia, should provide the rule of decision." *Id.* at 155. In cases such as this, where the victim was targeted because of his or her relationship to the United States government, the Court should apply the "law of the seat of the federal government." *Fritz*, 320 F. Supp. 3d at 91. Accordingly, the Court will proceed by applying the law of the District of Columbia. *See Id.* at 91 (applying District of Columbia law to a FSIA suit brought by the estates and family members of United States soldiers abducted and murdered serving in Iraq); *Owens*, 826 F. Supp. 2d at 154-55 (applying District of Columbia law to a FSIA suit brought by victims of terrorist bombings of two United States embassies in Africa); *Wamai v. Republic of Sudan*, 60 F. Supp. 3d 84, 89-90 (D.D.C. 2014), *aff'd in part vact'd in part on unrelated grounds in* 864 F.3d 751 (D.C. Cir. 2017) (explaining that courts generally "apply District of Columbia law to the claims of any plaintiffs for whom jurisdiction is proper, but who lack a federal cause of action under the FSIA").

Having determined that Plaintiffs can pursue a cause of action under state law and that District of Columbia law applies, the Court must now determine whether or not District of Columbia law provides a remedy for Plaintiffs. Plaintiffs request relief under the District of Columbia's intentional infliction of emotional distress law. The District of Columbia has adopted the Restatement (Second) of Torts' standard for the intentional infliction of emotional distress. In order to state a claim for intentional infliction of emotional distress, a plaintiff must allege "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff [to suffer] severe emotional distress." *Ortberg v. Goldman Sachs Grp.*, 64

A.3d 158, 163 (D.C. 2013) (internal quotation marks omitted). Extreme and outrageous conduct is defined as conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Id.* (internal quotation marks omitted). Conduct will be sufficient to sustain a claim for intentional infliction of emotional distress if "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Id.* (internal quotation marks omitted).

The Court finds that Plaintiffs have satisfied each of these elements. First, acts of terrorism—such as hostage taking, torture, and extrajudicial killing—are "by their very definition" extreme and outrageous. *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 77 (D.D.C. 2010) (internal quotation marks omitted). Second, the Court finds that Iran's conduct was intentional. Iran intentionally provided material support to the Badr Organization so that the Badr Organization could commit acts such as this with the goal of destabilizing Iraqi relationships with the United States and strengthening those relationships with Iran. *See* Ex. 13, Colonel Joel D. Rayburn et al., The U.S. Army in the Iraq War: Volume 1 2003-2006 187 (2019).

The third element for an intentional infliction of emotional distress claim—the plaintiff's severe emotional distress—requires additional discussion. Previously, there was some uncertainty in the law as to whether or not a family member had to be present at the scene of the incident in order to have a claim for intentional infliction of severe emotional distress. However, the Court of Appeals for the District of Columbia has since decided that the family member of a person injured by a terrorist attack does not have to be present in order to have a claim.

As the court explained, the presence requirement for intentional infliction of emotional distress claims serves multiple purposes such as protecting defendants from unwarranted liability and ensuring that compensation is awarded to only those with genuine claims. *Republic of Sudan v. Owens*, 194 A.3d 38, 42 (D.C. 2018). However, the purposes of the presence requirement are already satisfied by the jurisdictional requirements of the FSIA. *Id*. at 42-43 ("the very facts that justify stripping foreign sovereigns of their immunity allay the concerns that the presence requirement was designed to address"). Defendants are protected by the jurisdictional requirements of the FSIA because "when foreign states provide material support for terrorist attacks, it should come as no surprise that the acts they facilitated have caused severe emotional distress to persons who were not present at the time." *Id*. at 43. And, "the risk of trivial or feigned claims is exceedingly low when the anguish derives from a terrorist attack *that killed or injured* a member of the plaintiff's immediate family." *Id.* Accordingly, the Court finds that the fact that Plaintiffs were not physically present to witness S.F.'s hostage taking, torture, and death does not prevent Plaintiffs from establishing their severe emotional distress.

And, five of the six Plaintiffs have presented evidence they suffered severe emotional distress due to the acts of terrorism directed against S.F. M.S. "suffered severe mental and emotional injuries from listening to [his] father scream as the kidnappers tortured him." He still has images of his father's tortured body that "permanently scarred [his] mind and soul." *See* Dec. of M.S., ECF No. 29-2, ¶¶ 53-66 (M.S. description of severe emotional distress). S.S. was left not only with the trauma of regularly hearing his father's screams while negotiating with the kidnappers, but also with his own near-death encounter while attempting to pay the ransom for S.F. He continues to feel guilt and sadness "imagin[ing] what [he] could have done differently to save [his] father's life." Dec. of S.S., ECF No. 29-4, ¶¶ 24-39 (S.S. description of severe

emotional distress). S.A. explains that his father's death caused his personality to dramatically change. "[He] lost a lot of [his] friends and [his] relatives tell [him] that [he is] no longer the same person they used to know. [He] started laughing less, getting more stressed, and losing [his] temper easily. [He] quit playing basketball and stopped hanging out with [his] friends." Dec. of S.A., ECF No. 29-5, ¶¶ 23-33 (S.A. description of severe emotional distress). B.A. experienced shock and denial after the death of his father. "[His] drive to succeed in school was gone and [he] began to feel paranoid. [He] was always looking behind [him], wondering if [he] was next." Dec. of B.A., ECF No. 29-6, ¶¶ 17-22 (B.A. description of severe emotional distress). Finally, W.A. reports that "[t]he pain [she] went through during those five days [of S.F.'s kidnapping] was so unbearable that it created a hole in [her] heart. [She] used to wake up in the morning happy to prepare a meal for [her] husband, but now [she is] a refugee moving from one country to another, getting around without [her] husband and without his support." W.A. as been to psychological counseling and takes medication. Dec. of W.A., ECF No. 29-3, ¶¶ 30-34 (W.A. description of severe emotional distress). As such, Plaintiffs M.S., S.S., S.A., B.A., and W.A. have all provided convincing evidence of severe emotional distress.

However, no evidence has been provided as to the effect of these terrorist acts on Plaintiff B.S., S.F.'s grandson. Plaintiff B.S. was less than one year old at the time of the acts and did not have the capacity to experience severe emotional distress as a result of the acts. During the December 5, 2019 hearing, Plaintiffs' counsel admitted as much, explaining that "given the age of the grandson, we can't really make a case" for an intentional infliction of emotional distress claim. Tr. 240: 11-17. As such, the Court finds that B.S. has not established his right to relief under the District of Columbia's intentional infliction of emotional distress law. Accordingly, the Court DENIES Plaintiff B.S.'s request for default judgment. However, during the hearing, S.S.,

B.S.'s father, testified as to how the death of S.F. caused him emotional distress on behalf of his son for his loss of a future close relationship with S.F. Tr. 152: 14-153: 12. S.S. explained that his son's inability to know and learn from S.F. "was a big thing for us." Tr. 152: 20-21. Moreover, worrying about B.S. in the aftermath of S.F.'s death and the family's financial and emotional struggles as refugees in Jordan caused S.S. additional emotional distress. Tr. 153: 3-6 (explaining that S.S. could not send his son to school in Jordan). In calculating the damages of S.S., the Court may also take into account S.S.'s additional emotional distress on behalf of his son, B.S.

In summary, the Court concludes that Plaintiffs can bring state law claims against Iran pursuant to District of Columbia law. Additionally, five of the six Plaintiffs have established claims for the intentional infliction of emotional distress against Iran. However, Plaintiff B.S. has failed to provide convincing evidence of his claim for the intentional infliction of emotional distress. As such, the Court DENIES Plaintiff B.S.'s request for default judgment.

**C. Personal Jurisdiction**

The Court has personal jurisdiction over Iran. "Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction . . . where service has been made under section 1608 of this title." 28 U.S.C. § 1330(b). The Court has already concluded that it has subject matter jurisdiction over the claims in this case. Moreover, service has been made under section 1608. On April 3, 2019, the Court received a Return of Service Affidavit indicating that Iran was served on March 5, 2019. ECF No. 22. Plaintiffs affected service on Iran through delivery of the service documents to the Iranian Ministry of Foreign Affairs under cover of diplomatic note. 28 U.S.C. § 1608(a)(4). As such, the Court finds that Plaintiffs properly served Iran. And, there are no due process concerns raised by the Court's

exercise of personal jurisdiction over the Defendant because "foreign states are not 'persons' protected by the Fifth Amendment." *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 96 (D.C. Cir. 2002).

## D. Damages

Lastly, S.F.'s estate as well as the Plaintiff family members request damages for S.F.'s kidnapping, torture, and death. Each of the five Plaintiffs who successfully made a claim for intentional infliction of emotional distress have also provided evidence of their damages. Following S.F.'s death, Plaintiffs fled to Jordan as refugees with no money and no property. They had "lost everything." Tr. 88: 20-22. They all lived in a two-bedroom apartment, totaling at least six adults and one child. Tr. 88: 23-24. As refugees, they could not continue in their careers, and, without those careers, they could not afford to support themselves. Tr. 88: 25. S.S.'s son, B.S., could not attend school because a "refugee is not considered a legal resident of a country in Jordan." Tr. 153: 5-6. In Jordan, all Plaintiffs "struggled a lot." Tr. 89: 2. After two to three years as refugees in Jordan, all Plaintiffs moved to the United States where they have since become productive United States citizens.

However, while Plaintiffs have managed to make the best of extremely unfortunate circumstances, they faced many hardships along the way. In fleeing Iraq, Plaintiff M.S. was forced to give up his career as a surgeon as well as break off his engagement with his fiancé. Dec. of M.S., ECF No. 29-2, ¶¶ 56-57. M.S. is unsure if he will ever be able to practice medicine again. Tr. 98: 18-21. Plaintiff S.S. was also forced to give up his career as a medical doctor. Dec. of S.S., ECF No. 29-4, ¶ 38. Additionally, S.S. has lingering anxiety and guilt from the failed ransom drop-off during which he was hit by a car and shot at. *Id.* at ¶ 36. Plaintiff S.A. was unable to take his exams following his father's death and lost an entire year of school tuition.

Dec. of S.A., ECF No. 29-5, ¶ 24. In Jordan, his new school did not recognize many of the credits he had previously received, so he had to spend significantly more money as a foreign student without his father's financial help. *Id.* at ¶ 25. Plaintiff B.A. had previously intended to work alongside his father in the family business. Dec. of B.A., ECF No. 29-6, ¶ 20. Without his father, B.A. had a much more difficult time in school both academically and financially. *Id.* at ¶¶ 17-18. Finally, W.A. continues to suffer acutely from the loss of her longtime husband. She has been in counseling, takes many medications, and has suffered two heart attacks. Dec. of W.A., ECF No. 29-3, ¶¶ 32-33. She explains, "I still have a hard time falling asleep. I think about my husband, my home, my friends, my family, my neighbors, my high school, and the city where I grew up. I often wonder if I will ever have the chance to go back or if I will die away from all of the things I once loved." *Id.* at ¶ 34.

The Court has made findings as to the effects of S.F.'s kidnapping, torture, and killing on Plaintiffs. The Court hereby refers the issue of specific money damages to Magistrate Judge Michael Harvey for a determination. In making such determination, Magistrate Judge Harvey may refer to the Court's findings in this Memorandum Opinion, to the transcript of the December 5, 2019 hearing, to the affidavits of the Plaintiff family members, and to any other relevant evidence. The Court will enter a separate Order for these proceedings.

## V. CONCLUSION

For the foregoing reasons, the Court GRANTS default judgment against Defendant Iran in this case as to all Plaintiffs, with the exception of Plaintiff B.S. for whom default judgment is DENIED. As explained above, the Court shall refer this matter to Magistrate Judge Harvey to

determine specific money damages.  An appropriate Order accompanies this Memorandum

Opinion.

                                            ____/s/_____
                                            COLLEEN KOLLAR-KOTELLY
                                            United States District Judge